**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | |
|---|---|
| AMANDA DELOACH SLAPPEY, *Individually, as Administrator of the Estate of* John Mark Slappey, *and as Mother and Next Friend of SAS, a minor child* : : : : : : : | |
| Plaintiffs, : : | |
| v. : : | CASE NO.: 1:11-cv-93 (WLS) |
| UNITED STATES OF AMERICA, : : | |
| Defendant. : : | |

**ORDER**

Before the Court is Defendant United States of America's Motion to Dismiss. (Doc. 10.) For the reasons that follow, the United States' motion is **GRANTED**.

### I.     Procedural Background

John Mark Slappey drowned while duck hunting near the Jim Woodruff Lock and Dam in Lake Seminole, a reservoir owned and operated by the United States Army Corps of Engineers (the Corps). His survivors brought suit against the United States under the Federal Tort Claims Act (FTCA) and the Suits in Admiralty Act (SIAA). (Docs. 3, 37.) They claim the Corps was negligent for failing to warn Slappey of the hazards of hunting near the dam; for failing to keep the lake adjacent to the dam reasonably safe for visitors; and for failing to inspect, maintain, and repair a warning sign, buoys, and a life ring.

After answering the complaint, the United States filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. (Doc. 10.)

1

The United States argues it is immune from suit under the FTCA and the SIAA because the maintenance and placement of safety features near Jim Woodruff Dam involved an exercise of discretion. The Parties mutually agreed to proceed to discovery on the limited question of whether the complained-of actions or omissions were discretionary. The discovery period and the briefing stage have now concluded.

The following facts have emerged from discovery. Lake Seminole is a "run of the river lake," meaning that upstream water flowing into the lake is eventually released downstream. (Doc. 10-60 ¶ 13.) It is part of the Apalachicola-Chattahoochee-Flint Rivers System. The Corps maintains the lake's water level, which often varies a few feet, by opening and lowering the spillway gates of Jim Woodruff Dam. The dam also generates electricity through a powerhouse situated next to the dam. The dam itself is about 766 feet long, and a walkway atop the dam is about thirty feet from the lake surface.

The dam and upstream pool are marked with several safety features. First, on top of the dam, the Corps erected a large sign with three-foot red letters, which read, "DANGER STAY 800 FEET FROM DAM," facing upstream. This sign does not comply with the Corps' most recent sign standards, but the Mobile District, the local division in charge of the project, had received permission to deviate from the standards. Additionally, the Corps drove a number of dolphins into the lakebed. On the front of the dolphins are signs reading, "BOATS KEEP OUT." Between the dolphins, the Corps strung red-orange buoys with cable.

Prior to Slappey's death, the area around Lake Seminole had experienced heavy rain and flooding. (Doc. 10-60 ¶ 15; Doc. 35-5 at 6–7.) As a result, the Corps had raised the spillway gates to release extra water. (Doc. 35-5 at 6–7.) The rain and elevated gates

caused a strong current. Around December 10, 2009, the current carried debris into the buoy line and separated a segment of the line. The Corps ordered the buoy line's repair (Doc. 34-10), but, because of the danger of boating near the buoy line, the Corps has a policy of repairing buoy lines only when the spillway gates are closed (Doc. 10-60 ¶ 15). By December 20, 2009, the line had not been repaired.

According to dam superintendent Jason Barrentine, the dolphin-secured buoy line is the best feasible safety device to secure the area. (Doc. 10-60 ¶ 8.) A larger barrier would accumulate debris, which must be allowed to pass through the dam. The Corps does not have the equipment to remove debris. The dolphins, on the other hand, allow debris to pass through the dam but prevent the entire line from becoming detached. As for the sign, the Corps likely could not accommodate a larger, higher sign than the one atop the dam, except by elaborate construction, because cranes that raise and lower the dam take up usable space.

On Sunday, December 20, 2009, Slappey went duck hunting in Lake Seminole near the dam with his half-brother Andrew Dismuke. Slappey and Dismuke's duck-hunting strategy involved a Gunnison Float Tube, a camouflaged one-man inflatable chair. (Doc. 34-1 at 14.) Slappey, who was not wearing a life jacket, floated in the Gunnison in the lake while Dismuke, in a motor boat, drove upstream to flush ducks toward him. (*Id.* at 25–26.)

At some point, a current carried Slappey through the dam's buoy line. It happened that Anderson Construction, a contractor, was working overtime that Sunday repairing the dam's walkway. One of the contractors threw Slappey a life ring. The life ring or its rope broke as Slappey hung to it. He eventually passed through the spillway gates and drowned.

Barrentine testified that Sundays are not ordinary workdays and that, on a typical Sunday, it would have been unlikely for anyone to have even seen Slappey approaching the dam to attempt a rescue. Moreover, the life rings are not designed for turbulent waters like the kind that caught Slappey. Rather, they are used for calm waters, and these particular life rings complied with U.S. Coast Guard standards. Because the rings are made of synthetic materials and coated in a type of vinyl, they do not decay or deteriorate. The Corps did not have any other safety features in place at the dam to rescue someone like Slappey.

## II. Discussion

### a. Motion to Dismiss Standards

A party may assert by motion the defense of lack of subject matter jurisdiction, and the Court must dismiss an action if the Court finds that subject matter jurisdiction is lacking at any time. Fed. R. Civ. P. 12(b)(1) & 12(h)(3). Therefore, a federal court has not only the power but the obligation "to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises." *Beavers v. A.O. Smith Elec. Products Co.*, 265 F. App'x 772, 777 (11th Cir. 2008) (citing *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 n.4 (11th Cir.1999)).

Subject matter jurisdiction over an action may be attacked facially or factually. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.' " *McElmurray v. Consol. Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Lawrence v. Dunbar*, 919 F.3d 1525, 1529 (11th Cir. 1990)); *see also*

4

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) (citing *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n.5 (11th Cir. 2003)) ("[T]he court must, as with a Rule 12(b)(6) motion, take the complaint's allegations as true."). "Factual attacks," on the other hand, serve to "challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered.'" *McElmurray*, 501 F.3d at 1251.

The United States brings a factual and a facial attack to the Court's subject matter jurisdiction. Because the facial attack arguably was mooted with the amended complaint, the Court addresses only the factual attack. "In the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists." *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citations omitted).[1]

**B. Analysis**

"The United States, as a sovereign entity, is immune from suit unless it consents to be sued." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1188 (11th Cir. 2011). The FTCA waives that immunity for the torts of government employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C § 1346(b)(1); *Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1200 (11th Cir. 2008). But suits premised on a government employee's exercise of discretion are excepted from the FTCA's waiver of immunity. 28 U.S.C. § 2680(a). The statute provides:

---

[1] Because the relevant policy manuals are undisputed, the Court holds that the United States would prevail regardless of the burden.

> The provisions [of the FTCA] shall not apply to . . . [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

(*Id.*) "The discretionary function exception . . . marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). The Eleventh Circuit has held that the discretionary function exception also applies to the SIAA. *Cranford v. United States*, 466 F.3d 955, 958 (11th Cir. 2006) (citing *Mid-South Holdings Co., Inc. v. United States*, 225 F.3d 1201, 1203 (11th Cir. 2000)).

The Supreme Court has articulated a two-part test to determine whether a government employee's actions fall within the discretionary function exception. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). First, a court asks "whether the challenged conduct is a matter of choice for the acting employee." *Id.* "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *United States v. Gaubert*, 499 U.S. 315, 321 (1991) (quoting *Berkovitz*, 486 U.S. at 536.) Simply stated, a court must ask whether the government's conduct violated a mandatory derivative that allowed no judgment or choice. *Autery v. United States*, 992 F.2d 1523, 1526 (11th Cir. 1993) (citing *Gaubert*, 499 U.S. at 323).

6

Second, "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. "The exception is intended 'to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *OSI*, 285 F.3d at 950 (quoting *Gaubert,* 499 U.S. at 322–23). In addressing this question, the Supreme Court directs courts to "look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one we would expect inherently to be grounded in considerations of policy." *Autery*, 992 F.2d at 1530–31 (quoting *Baum v. United States*, 986 F.2d 716, 720–21 (4th Cir. 1993)). If a government policy or guideline allows a government agent to exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

### 1. Conduct at Issue

Before addressing whether the government's actions violated a mandatory directive, a court must define the conduct at issue. *Autry*, 992 F.2d at 1527. Plaintiffs assert that the conduct at issue is the following:

1. Defendants failed to warn of known hidden hazards and dangerous conditions in front of the dam which they created, thereby exposing visitors to unreasonable risk of injury or death, at a time when they knew the safety features and warning system in and around the dam were not compliant with their own regulations standards or policies, not functioning, and/or nonexistent.
2. Defendants failed to keep the premises reasonably safe for the uses intended, and failed to correct dangerous conditions on the property.
3. Defendants failed to inspect, maintain and repair or replace the safety features in and around the dam, including the dam sign, the buoy line, and the life ring.

7

(D0c. 34 at 6–7.) This description collapses the discretionary function inquiry into the question of whether the Corps was negligent. *Cf. Autry*, 992 F.2d at 1527–28. The Corps' purported negligence is irrelevant to whether its actions were discretionary. *Id.*

In *Autry v. United States*, the Eleventh Circuit reversed a district court for engaging in a similar inquiry. 992 F.2d at 1527–28. In that case, Plaintiff Roy Autry was killed and Charlotte Schreiner injured after a decaying tree fell on their car in the Great Smokey Mountain National Park. *Id.* at 1524. The plaintiffs contended that "the conduct at issue [is] the park's failure to carry out the mandates of its then existing policy of identifying and eliminating known hazardous trees." *Id.* at 1527. The district court, on the other hand, defined the inquiry as "whether the Park Service officials had discretion under their Tree Hazard Management Plan to remove 'hazardous' trees." *Id.* Both descriptions were "too narrow." *Id.*

In particular, the Eleventh Circuit explained that the district court "collapse[d] the question of whether the Park Service was negligent into the discretionary function inquiry. That is, after finding that the Park Service had knowledge of the danger of black locust trees, the district court imposed a 'reasonableness' requirement on the government's conduct." *Id.* at 1528. Under the FTCA, however, "[i]t is the governing administrative policy, not the [agency's] knowledge of danger . . . that determines whether certain conduct is mandatory for purposes of the discretionary function exception." *Id.* Therefore, the proper inquiry in *Autry* was "whether controlling statutes, regulations and administrative policies mandated that the Park Service inspect for hazardous trees in a specific manner." *Id.* In the absence of a clear mandate, the Park officials' procedure in identifying and removing decaying trees fell within the discretionary function exception. *Id.*

8

Likewise, the conduct at issue in this case is whether any controlling statute, regulation, or policy mandated that the Corps warn of hazards and maintain the area adjacent to the dam in a particular fashion.

### 2. Whether the Corps' actions or omissions involved a matter of judgment or choice

Having identified the relevant conduct, the Court turns to the first step of the *Berkovitz-Gaubert* test. The Court must determine whether the Corps violated a specific nondiscretionary mandate. *Autry*, 992 F.2d at 1528. Plaintiffs have failed to make that showing.

Congress authorized the Corps to construct the Jim Woodruff Dam in the Rivers and Harbors Act of 1946. *See* Pub. L. No. 79–525, 60 Stat. 634, 635 (1946). It provides that "the following works of improvement of rivers, harbors, and other waterways," including the Jim Woodruff Dam, "are hereby adopted and authorized to be prosecuted under the direction of the Secretary of War and the supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions by the Chief of Engineers in the respective reports hereinafter designated." *Id.* at 634. Outside of this broad authorization, the Parties have not identified, and the Court is unaware of, any relevant statute requiring particular upkeep or safety features at Lake Seminole or the Jim Woodruff Dam.

In the absence of a congressional directive, the Parties point to a number of manuals and engineering regulations and pamphlets. The Court agrees with the United States that these documents provided general objectives and guidelines and did not mandate any particular safety features or signs at the dam. And because "an agency manual which provides only objectives and principles for a government agent to follow

9

does not create a mandatory directive," *OSI, Inc. v. United States*, 285 F.3d 947, 952 (11th Cir. 2002), Plaintiffs have failed to establish the Court's subject matter jurisdiction.

Both parties claim the Corps' Sign Standards Manual (SSM) support their respective positions. The SSM standardizes sign legends and typography. The SSM, however, is clear that it provides guidance rather than mandates. *See Bailey v. United States*, 623 F.3d 855, 858, 861 (9th Cir. 2010) (applying discretionary function exception because "no regulation or guideline," including the 1987 SSM, "required the Corps to replace missing signs before a busy weekend or within a specific period of time"). The Introduction explains:

> [a]lthough every effort has been made to standardize sign legends, individual sign conditions vary from project to project so that the appropriateness of an individual sign to a given setting must be determined on a case-by-case basis as part of the sign plan. The project Sign Program Manager is responsible for making a sign plan for each specific site based on: geography, hazards, audience, traffic, and the uses for each site.

(SSM[2] at 1-8.) This provision gave local districts broad discretion in which signs to place and where to put them. Additionally, while certain sign standards—such as, "color, type face/fonts, formats, proportions, and Danger, Warning, and Caution legends"—are mandatory, the HQ Sign Program Proponent may grant deviations. (*Id.* at 2-1.) There is no dispute that, though the dam's warning sign did not comply with these standards, the HQ Sign Program Proponent granted a variation well before Slappey's death. It is therefore of no moment that the Corps chose to warn visitors of the dam generally rather than of specific hazards such as currents and undertow.

---

[2] Available at http://corpslakes.usace.army.mil/employees/sign/manual.cfm.

Plaintiffs seek to establish an absence of discretion from the Corps' Engineering Regulations (ERs) and Engineering Pamphlets (EPs). But they have failed to show that the Corps violated any provision of these documents. For example, ER 1130-2-500 and EP 1130-2-500 both require the Corps to use the SSM for Civil Works Projects. (Doc. 10-54 at 18; Doc. 10-55 at 14.) Like the SSM, ER 1130-2-500 and EP 1130-2500 mandate certain standards for signs absent permission to deviate. As already explained, there is no dispute the Corps obtained authorization to deviate from those standards.

EP 1130-2-520 also provides general guidance. (*See* Doc. 34-15.) It notes that the Corps shall address the use of buoys and other safety measures in an Operational Management Plan (OMP). (*Id.* at 7.) It also notes that "[p]hysical barriers to pedestrian and boater access will be erected *where practicable.*" (*Id.* (emphasis added).) Additionally, "[s]igns, buoys, and other marks or physical measures shall be maintained *in as good condition as practicable.*" (*Id.* (emphasis added).) Plaintiffs hope to prevail by emphasizing the various uses of "shall" in EP 1130-2-520. But, as directed, the Corps' OPM does addresses the use of buoys and other safety features. As to requirements for maintenance, the Eleventh Circuit has held that the word "shall" is not dispositive where, like here, a regulation contains other discretionary language. *Ochran v. United States*, 117 F.3d 495, 500 (11th Cir. 1997) (noting that word "shall" in U.S. Attorney General Guidelines did not remove discretion because it did not specify how to take a particular course of action); *Powers v. United States*, 996 F.2d 1121, 1125 (11th Cir. 1993) (applying discretionary function exception when statute provided that director of FEMA "shall *from time to time* take such action *as may be necessary*"). In other words, EP 1130-2-520 did not remove the Corps' discretion in determining how or when to maintain buoys and signs.

11

Plaintiffs also argue the Corps violated its OMP, which reads, in part, "Dangerous situations that will affect visitor movement on the project (washouts, low water hazards, etc.), will be barricaded, fenced, or marked with the appropriate navigational warning marker as soon as the problem is known." (Doc. 34-12 at 13.) They claim the "dangerous situation" in this case was the current and separated buoy line. There are several problems with this argument. First, the partial break in the buoy line was not a dangerous situation affecting visitor movement. The dangerous situation was the current and undertow, not the safety feature that warned of those things. Second, OMP left the Corps with a range of choices—barricades, fences, or "appropriate" warning markers—as to how to respond to dangerous situations. The Corps had already marked the dam's hazards and buoy line with navigational warning markers. Finally, a plain reading of the entire section shows that the Corps was referring to sudden hazards in areas for visitors. The sentence itself applies to dangerous situations "that will affect visitor movement" and provides washouts and low water hazards, problems that affect launching and navigation, as examples. Most of the paragraph is addressed to patrolling Ranger staff, and it mentions ramp closures on several occasions. Moreover, the same section on visitor safety later provides:

> Buoy lines are placed above and below the dam and powerhouse to prevent boaters/fishermen from entering these potentially dangerous areas.
> . . .
> Corps employees are responsible for buoys and signs which mark controlled areas, danger areas, "boats keep out" areas, and visitor information. In 1986–87, pilings were installed with the proper signs to mark small boat channels, hazards, boat keep out areas, and information at several strategic locations to reduce buoy maintenance costs and improve effectiveness.

12

It would be strange for the Corps to create a redundancy in their OMP requiring two responses to the same hazard. The dam is always a "potentially dangerous area," for which the Corps had provided signs and buoys, rather than a suddenly dangerous situation to visitor movement requiring a response "as soon as the problem is known." This construction is supported by several witnesses who testified that it is the Corps' policy to delay repairs to the buoy line until lake waters are still and the spillway gates are lowered. (Doc. 10-60 ¶ 15; Doc. 34-5 at 11.)

Moreover, the OMP's directive that "[i]mmediate priority is given to correcting problems that involve public, contractor, or employee safety" does not specify when or how to correct problems and thus did not create a mandatory standard. *Cf. Autry*, 992 F.2d at 1528 (finding that directive that the "saving and safeguarding of human life takes precedence over all other park management activities" did not create nondiscretionary mandate).

Finally, Plaintiffs claim the local district violated a Corps directive by failing to complete a Project Management Plan. They assert that the sign plan, a prerequisite to the Project Management Plan, has been pending since 2003 because the initial proposal did not have a Navigation Hazards Marking System (NHSM). But Plaintiffs have again failed to show how this violated any fixed mandate. Miriam Fleming, the district recreation sign program manager, testified that the local project likely would have had to have the NHSM completed if the Corps required local districts to resubmit their sign plans. There is no evidence the Corps required them to do so. Additionally, the approval for the sign plan states, "The enclosed *Project Sign Plan*, is in compliance with the guidance provided by HQUSACE and is complete, with the exception of any pending action that has been noted with the plan (see PENDING). It may be implemented on

13

January 1, 2003." The pending section notes that NHSMs are often delayed by lack of appropriate conditions to determine the hydraulic line. In any event, a "[p]atrial update to the Lake Seminole Sign Plan" explains that "[t]he current use of U.S. Coast Guard Aids to Navigation system buoys and signs, in addition to dolphins, physical barriers and existing dam signage, meet current minimum requirements." In short, Plaintiffs have not provided any evidence that the possible pending status violated a fixed mandate.

To the extent Plaintiffs rely on the *Guidelines for Public Safety at Hydropower Plants* and *Safety Signage at Hydropower Projects*, these guidelines apply only to non-federal entities. The U.S. Department of Energy and the Federal Energy Regulatory Commission promulgated these guidelines under the Federal Power Act, 16 U.S.C. § 791a *et seq.*, to provide guidance to people, states, or municipalities licensed to construct dams, §§ 796, 797.

In summary, Plaintiffs have failed to identify any fixed, readily ascertainable standard requiring a particular course of conduct at the dam or lake that Corps employees failed to follow.

### 3. Whether the judgment is of the kind that the discretionary function exception was designed to shield

The Court agrees with the United States that the Corps' exercise of discretion at Lake Seminole and the Jim Woodruff Dam is susceptible to policy analysis. Initially, because the Corps acted with discretion, the Court must assume those acts are grounded in public policy. *Gaubert*, 499 U.S. at 324. Moreover, federal courts tend to hold that similar discretionary decisions are grounded in public policy. *E.g., Autry*, 992 F.2d at 1531.

For example, in *Autry*, the Eleventh Circuit held that the Corps' method for inspecting and removing hazardous trees was susceptible to public policy analysis. 992 F.2d at 1531. The court reasoned that the Park Service likely had to weigh the risk of harm in various locations, the need for other safety programs, forest preservation, and the service's limited financial resources. *Id.* Similarly, in *Graves v. United States*, 872 F.2d 133 (1989), the Sixth Circuit held that the type of signs used at a closed lock and dam were susceptible to policy analysis because the Corps employee considered the cost, feasibility of maintenance, and effectiveness of various types of warnings. 872 F.2d at 137. In a case remarkably similar to this one, the Ninth Circuit in *Bailey v. United States*, 623 F.3d 855 (9th Cir. 2010), reasoned that the Corps' decision as to when to replace signs washed away in heavy river flows was susceptible to policy analysis because "[t]he Corps had to balance the safety of its workers and the risk of limited resources, i.e., its equipment, in replacing the signs in dangerous conditions against the competing public safety interest in having the signs replaced sooner." 623 F.3d at 862.

Here, as in those cases, the Corps had to weigh a range of competing factors in placing and maintaining safety features around the dam. The Corps had to consider the cost and feasibility of certain safety features and their effectiveness in warning about the hazards at the dam. Additionally, in erecting the buoy line, the Corps had to consider whether other barricades would have accumulated debris or interfered with dam maintenance and visitor recreation. The balancing of these factors is evinced in Barrentine's statements. He testified that the Corps specifically chose the buoy system secured by dolphins because it prevented the entire line from becoming loose and allowed debris to pass through the dam. Additionally, the Corps had to weigh its employees' safety versus the necessity of repairing a single segment in the buoy line

15

when the spillway gates were open. As for the sign, Barrentine testified that a larger or higher sign would have interfered with the cranes. In determining whether to include other safety devices at the dam, the Corps likely had to weigh the probability of a single person floating near the dam and the likelihood of a Corps employee being near the dam to attempt a rescue.

The Court finds that the decisions regarding the safety features at the dam are susceptible to policy analysis.

### III.   Conclusion

For those reasons, the United States' Motion to Dismiss (Doc. 10) is **GRANTED**. Plaintiffs' complaint is **DISMISSED**. It is hereby **ORDERED** and **ADJUDGED** that judgment shall be entered in favor of the United States.

**SO ORDERED**, this  25th   day of September 2013.

  /s/ W. Louis Sands
**THE HONORABLE W. LOUIS SANDS,
UNITED STATES DISTRICT COURT**